UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAM MUNTZ,

                              Plaintiff,

                                                                   DECISION AND ORDER

                                                                     07-CV-6020L

                         v.

MICHAEL J. ASTRUE,
Commissioner of The Social Security
Administration,[1]

                              Defendant.
_____

## INTRODUCTION

This is an action brought pursuant to *42 U.S.C. §§ 405(g) and 1383(c)(3)* to review the final determination of the Commissioner of Social Security ("the Commissioner") that William K. Muntz ("plaintiff") is not disabled under the Social Security Act ("the Act") and, therefore, is not entitled to a period of disability and Disability Insurance benefits. The parties have both filed motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkts. #4, #5).

For the reasons discussed below, plaintiff's motion is granted, the Commissioner's motion is denied, and the case is remanded for the calculation and payment of benefits.

_____

[1] Plaintiff's complaint names former Commissioner of Social Security Joanne B. Barnhart as the defendant. Michael J. Astrue, the current Commissioner, automatically is substituted as the defendant pursuant to Fed. R. Civ. P. 25(d)(1).

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff applied for Social Security Disability benefits on August 25, 2003, alleging disability as of February 4, 2003 due to, inter alia, a back injury. (T. 59-61). At the time of his application, plaintiff was 44 years old. (T. 59). His education includes two years of college without a degree. (T. 79). His past relevant work was as an insurance and investments salesperson from 1987 until February 4, 2003. That work involved meeting with clients at their homes, and carrying a computer. Plaintiff also periodically worked as a Prudential Company manager, responsible for recruiting new sales persons. (T. 256-257).

Plaintiff applied for disability benefits after sustaining back injuries as the result of a fall at work on January 9, 2003. (T.124). Plaintiff attempted to resume work for another month, but found that he was "so spaced out" on the pain medications prescribed for him that it was impossible to responsibly handle the complicated financial matters that his position required. (T. 257). His last day worked was February 4, 2003. (T. 255).

Since his fall, plaintiff has treated continuously with his doctors at the Greece Medical Center, including Dr. Deshmukh, Dr. Lebowitz and Dr. Silberstein. On January 10, 2003, Dr. Deshmukh found that plaintiff's straight leg raising test was positive on the right at 40 degrees, and that plaintiff had decreased strength in his right foot and great toe. Sensory exam was significantly diminished on plaintiff's right side, as was his knee jerk reflex. Sciatica was noted, and Dr. Deshmukh recommended an MRI of plaintiff's lumbar spine. (T. 124).

On January 29, 2003 and May 7, 2003, plaintiff saw Dr. Lebowitz, who opined that plaintiff was temporarily totally disabled and should be referred to neurosurgery. He noted that plaintiff

moved slowly, had diminished trunk flexion, a straight leg raising test that was positive at 30 degrees on the right side, and complained that his right leg was periodically "giving out." (T. 125-127). He diagnosed plaintiff with cervical and lumbar radiculopathy (disorder of the spinal nerve roots) with an L3-L4 disk herniation toward the right side. (T. 186).

On July 8, 2003, plaintiff consulted with Dr. Silberstein and opted not to undergo surgery, concluding that the risks outweighed the potential benefits. Dr. Silberstein noted plaintiff's low back pain, secondary to lumbar disk herniation and chronic neck pain. (T. 184).

On November 5, 2003, plaintiff was examined by Dr. Yu, a State agency medical consultant. Dr. Yu opined that plaintiff was capable of sedentary work, with certain limitations, illegible on the report. (T. 157).

On January 5, 2004, plaintiff treated with Dr. Lebowitz and reported prickly sensations in his left thigh. He complained that he often dropped things due to numbness in his hands. Plaintiff's hand strength and mobility were found to be diminished. Plaintiff remained on Percocet, a narcotic analgesic, for pain. (T. 183)

On January 23, 2004, plaintiff followed up with Dr. Lebowitz, reporting electric-shock-like sensations in his left leg, and pain in his neck, arms and lower back. (R. 182).

On March 23, 2004, plaintiff, now on multiple pain medications including Neurontin, Percocet, Ambien, Nortriptyline and Flexeril, continued to complain of leg pain and electricity-like sensations. He reported difficulty with driving more than short distances, or walking, and was beginning to feel depressed. His lower back remained tender, back flexion and straight leg raising were limited, and his leg strength and sensation were diminished. (T. 180-181). Additional

medications for depression and pain, Fluoxentine and Oxycodone, were prescribed. (T. 178-179). Additional visits with Dr. Lebowitz showed plaintiff's condition to be largely unchanged. (T. 176-177, 206).

On August 16, 2004, plaintiff began treating with Dr. Apostol. Dr. Apostol's objective findings included tenderness over the cervical and upper thoracic spine, diminished deep tendon reflexes in the upper extremities, left hand grasping weakness, and neck and low back pain with meralgia paresthetica (burning or tingling pain along the thigh, caused by nerve entrapment). Dr. Apostol prescribed a back brace, physical therapy and continued medication. (T. 208).

On January 14, 2005, plaintiff presented to Dr. Apostol reporting intensification of the sensations in his right leg and episodes of buckling at the knees from weakness. Dr. Apostol diagnosed a decreased right knee reflex and weakness in the lower extremities, especially on the right side. Plaintiff continued to utilize a cane in order to walk, and Dr. Apostol recommended a back brace for stability. Plaintiff was instructed to use Effexor XR, an anti-depressant, and Oxycontin and Percocet. (T. 242).

On April 7, 2005, Dr. Apostol noticed that plaintiff was dragging his right foot, and investigated a possible foot drop diagnosis. On examination, plaintiff had decreased flexion in his right foot and decreased muscle mass, suggestive of having originated as the result of problems with his back and neck. Dr. Apostol suggested an orthopedic brace for plaintiff's right foot, and refitting of his back brace. (T. 230).

On June 23, 2005, having been fitted with an orthotic for the right foot and a back brace, plaintiff reported some improvement in his ambulation, but continued to have pain and intermittent

cramping in his lower back, right hand and lower extremities which were not responding well to the usual pain medications, causing difficulty sleeping and accomplishing daily activities. (T. 221, 223). Dr. Apostol suggested increasing plaintiff's Oxycontin and Percocet, and opined that "he continues to be on total disability secondary to his back and neck pains as well as associated foot drop and possibly now also de Quervain's Tenosynovitis (inflammation of tendons in the wrist) on the right." (T. 221).

On May 1, 2003, plaintiff was seen by Maureen Mahoney, a physicians' assistant, for evaluation of his back and right leg pain. Upon examination, plaintiff's right foot, toe and great toe demonstrated weakness, and right knee jerk was diminished. An MRI scan of his lumbar spine was reviewed and demonstrated a right side disk herniation at L3-L4, with displacement of the L3 nerve root. (T. 142-143).

The following day, plaintiff was seen by Dr. Silberstein, who opined that plaintiff's right leg symptoms, including foot drop, were related to the disk herniation and nerve root compression shown on the MRI films. He recommended surgery to remove the disk, but cautioned plaintiff that it would not necessarily improve his back pain. (T. 141).

On July 2, 2003, a follow-up MRI confirmed degenerative disc disease with central and right-side bulging at the C3-C4 level, and at the C6-C7 level. (T. 138-139).

Plaintiff was also examined by Dr. Devanny, a physician employed by plaintiff's Workers' Compensation insurance carrier. On July 31, 2003, Dr. Devanny confirmed diagnoses of a herniated disk at L3-L4 level, left-side tennis elbow, and degenerative disk disease of the cervical spine. (T.

172). He opined that if plaintiff were to return to work, he could only do so for a maximum of 2-4 hours per day, and could not lift, carry, push or pull items weighing more than 15 pounds. (T. 173).

Dr. Devanny examined plaintiff again on December 16, 2003. He noted objective findings of decrease4d right ankle jerk, and confirmed the MRI findings of a herniated disk at L3-L4. He opined that if plaintiff were to return to work, he could not lift items greater than 20 pounds and would have to avoid repetitive bending and stooping. (T. 167). On a subsequent examination of plaintiff on May 27, 2004, however, Dr. Devanny reverted to his previous findings and stated that plaintiff could work for only 2-4 hours per day, and would be restricted from lifting, carrying, pushing or pulling items in excess of 15 pounds. (T. 162).

Consulting physician Dr. Medalle examined plaintiff on October 6, 2003. He noted that plaintiff's gait was abnormal without his cane, and that plaintiff had difficulty maintaining a sitting or standing position, squatting fully, walking on heels and toes, lying down and rising from a recumbent position. Cervical spine flexion and extension were limited to 30 degrees. Lumbar spine flexion was limited to 45 degrees. A straight leg raising test was positive at 30 degrees on the right side, both for sitting and supine positions. (T. 155). Dr. Medalle concluded, "[c]laimant was markedly limited in activities requiring prolonged sitting, prolonged standing, bending, and lifting because of discogenic disorder of the lumbar spine. He is moderately limited in activities requiring repetitive movement of the head because of discogenic disorder of the cervical spine. He is mildly limited in repetitive use of the left hand because of left lateral [tennis elbow]." (T. 156).

Plaintiff thereafter filed for disability benefits, citing severe pain in his lower back, inability to maintain mental focus, difficulty walking, standing or sitting for long periods of time, depression,

headaches, and medicinal side effects including drowsiness and difficulty thinking and concentrating. (T. 273). Upon initial review, plaintiff's application for disability benefits was denied on December 3, 2003. (T. 44-47). Plaintiff timely appealed, and a hearing was held on September 29, 2005 before Administrative Law Judge Melvin D. Benitz, ("ALJ"), at which plaintiff appeared with counsel and testified. (T. 25-32).

Specifically, plaintiff explained that he had declined surgery because his specialists had predicted that it presented only about a 50% chance of correcting just a portion of his back problems. Because the remainder of his back problems were not suitable for surgical correction, he had instead opted to continue with physical therapy, medication and the use of a TENS unit. (T. 258).

Plaintiff reported that notwithstanding this treatment, he had constant, knife-like pain in his spine, shooting down his leg and into his knee, which he rated to be an 8 or 9 on a 10-point scale. (T. 259). His right leg occasionally went numb and had given out on several occasions. He continued to wear an orthotic device on his right foot to assist with foot drop. (T. 261). He experienced neck pain the majority of the time, as well as numbness in his hands, primarily the right, radiating from his neck. He could not easily move his head back and forth, and was unable to touch his chin to his chest. Due to difficulty in bending his lower back, his wife assisted with tasks requiring bending, or else plaintiff used a grabbing device to pick up objects from the ground. His wife assisted him in dressing and bathing. (T. 267).

Plaintiff estimated that he could walk 25-50 feet before he needed to stop and rest, and that if he walked an appreciable distance more than two days per week, he would experience increased pain and difficulty moving the following day. He continued to use a cane for short distances, and

utilized a motorized scooter to go outdoors. (T. 262-264). He had difficulty sitting or standing for more than 15 minutes, and could lift no more than ten pounds without severe pain resulting. (T. 265). He also reported difficulty concentrating, remembering, sleeping, grasping objects with his right hand, and writing. Plaintiff believed that his pain medications made him tired and irritable. (T. 271-275).

Vocational expert James Ryan also testified at the hearing. The ALJ asked Ryan to assume a 43-year old person with degenerative disk disease in the neck and lumbar spine with some radiation into the feet, tennis elbow at some point, decreased range of motion, inability to stand and ambulate, headaches, all of which "are somewhat relieved by medication without significant side effects" except for some fatigue, who was depressed, who could not repetitively turn his neck, and needed to avoid pushing and pulling from the right upper extremity, who had to avoid overhead reaching, temperature extremes, and bending, who required the ability to change between sitting and standing positions every 15-20 minutes and to use a cane. (T. 276-277). Given this hypothetical, Ryan opined that the individual would be able to perform several sedentary or light work jobs, including security monitor, machine tender, appointment clerk, inspector, bench worker, and finish machine operator. (T. 280).

On cross examination, Ryan was asked whether plaintiff could perform any of the proposed jobs if he needed to be absent from his work station for a total of three hours during an eight-hour workday due to symptoms and effects of his pain medications, and/or if he had frequent "bad days" which caused him to be unable to work for one more workdays per week. Given this level of absenteeism, Ryan opined that such a person would not be employable. (T. 278-282).

On November 2, 2005, the ALJ issued a decision finding that plaintiff was not disabled because he could perform several jobs at the "light duty" exertional level, as testified to by the vocational expert. (T. 13-22). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on November 15, 2006. (T. 5-8). This action followed.

## DISCUSSION

### I.     Standard for Determining Disability

Under the Social Security Act ("the Act"), a person is considered disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). A physical or mental impairment (or combination of impairments) is disabling if it is of such severity that a person "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* at §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled within the meaning of the Act, the ALJ proceeds through a five-step sequential evaluation. *Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 CFR §404.1520(b). If so, the claimant is not disabled. If not, analysis proceeds to step two.

On November 2, 2005, the ALJ issued a decision finding that plaintiff was not disabled because he could perform several jobs at the "light duty" exertional level, as testified to by the vocational expert. (T. 13-22). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on November 15, 2006. (T. 5-8). This action followed.

## DISCUSSION

### I.     Standard for Determining Disability

Under the Social Security Act ("the Act"), a person is considered disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). A physical or mental impairment (or combination of impairments) is disabling if it is of such severity that a person "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* at §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled within the meaning of the Act, the ALJ proceeds through a five-step sequential evaluation. *Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 CFR §404.1520(b). If so, the claimant is not disabled. If not, analysis proceeds to step two.

At step two, the ALJ must determine whether the claimant has an impairment, or combination of impairments, that is "severe," e.g., that imposes significant restrictions on the claimant's ability to perform basic work activities. 20 CFR §404.1520(c). If not, the analysis concludes with a finding of "not disabled." If so, the ALJ continues to step three.

At step three, the ALJ examines whether the claimant's impairment meets or equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4. If the claimant's impairment meets or medically equals the criteria of a listing and meets the durational requirement (20 CFR §404.1509), the claimant is disabled. If not, analysis proceeds to step four.

At step four, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or metal work activities on a sustained basis notwithstanding limitations for the claimant's collective impairments. *See* 20 CFR §404.1520(e), (f). Then, the ALJ determines whether the claimant's RFC permits him to perform the requirements of his past relevant work. If so, the claimant is not disabled. If not, analysis proceeds to the fifth and final step.

The claimant bears the burden of proof throughout steps one through four. However, at the fifth step, the burden shifts to the Commissioner to show that the claimant is not disabled, by presenting evidence demonstrating that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his age, education, and work experience. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir.1999), *quoting Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir.1986). *See* 20 CFR §404.1560(c).

## II. Standard of Review

The Commissioner's decision that plaintiff is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir.2002); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "The Court carefully considers the whole record, examining evidence from both sides 'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Tejada*, 167 F.3d at 774, *quoting Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir.1997). Still, "it is not the function of a reviewing court to decide *de novo* whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir.1999). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute our judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir.2002).

Such a deferential standard, however, is not applied to the Commissioner's conclusions of law. *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.1984); *accord Tejada*, 167 F.3d at 773. This Court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled. "Failure to apply the correct legal standards is grounds for reversal." *Townley*, 748 F.2d at 112. Therefore, this Court is to first review the legal standards applied, and then, if the standards were correctly applied, consider the

substantiality of the evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987) ("[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles"). *See also Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir.1998).

### III.  The ALJ's Decision

Here, the ALJ found at step one that the claimant had not engaged in substantial gainful activity since February 4, 2003. (T. 18). The ALJ found at steps two and three that plaintiff had a severe impairment consisting of cervical and lumbar degenerative disc disease, but that these conditions did not meet or equal any listed impairment. (Tr. 18-19). The ALJ found at step four that plaintiff lacked the residual functional capacity ("RFC") to perform his past relevant work as an insurance and investments sales person, traveling to clients homes and carrying a computer, but retained the RFC to perform sedentary to light exertional work with the option to sit or stand at will, with no repetitive turning of the neck or overhead reaching, and limited pushing and pulling. (T. 21). Based on testimony from the VE, the ALJ concluded at step five that plaintiff was not disabled because he could perform other jobs found in significant numbers within the national economy, including the positions of security monitor, machine tender, appointment clerk, inspector, bench worker, and finish machine operator. (T. 22).

### IV.  Remand is Required

The Commissioner argues that substantial evidence in the record exists to support the ALJ's decision that plaintiff is able to perform other work in the national economy. Plaintiff, on the other

hand, argues that the ALJ's decision is based upon legal error. Plaintiff claims, *inter alia*, that the ALJ erred at step three in not finding plaintiff disabled under Listing 1.04, (Disorders of the Spine), substituted his own opinion for the valid medical opinions of plaintiff's treating physicians and some of the examining physicians, and failed to properly determine plaintiff's RFC.

I agree with plaintiff. The ALJ's findings in applying the relevant listing are not supported by substantial evidence in the record. To the contrary, the record establishes that plaintiff's condition does meet or equal a listed impairment. As such, this case is remanded for the calculation of benefits.

**A.    Listing 1.04 - Disorders of the Spine**

At step three, the ALJ found that plaintiff's severe impairment did not meet or equal Listing 1.04 for disorders of the spine, defined in relevant part as:

> 1.04 Disorders of the Spine (e.g., . . . spinal arachnoiditis, spinal stenosis, . . . degenerative disc disease . . . ) resulting in compromise of a nerve root (including the cauda equina) or spinal cord. With: (1) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associates muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine) . . .

20 CFR Pt. 404, Subpt. P, App. 1, §1.04A.

The ALJ found that although the claimant suffered from degenerative disc disease, "[d]ocumentation of the requisite evidence of nerve root compromise, spinal arachnoiditis (inflammation of the spinal cord, causing persistent pain, twitching, or odd sensations in the lower body), or lumbar spinal stenosis (compression of the spinal cord, usually resulting in back pain) resulting in pseudoclaudication (pain or cramping in the legs) is not satisfied." (T. 20) (parenthetical

exposition added). The ALJ further concluded that "[t]here is no atrophy and [claimant's motor skills] were essentially normal." *Id.*

Plaintiff points to the fact that the Commissioner's conclusion overlooks substantial evidence in the record of claimant's nerve root compression, neuro-anatomic distribution of pain, pain in the lower extremities, limitation of motion due to atrophy, and/or positive straight leg raising, which plaintiff believes are sufficient to meet or equal Listing 1.04. Specifically, plaintiff notes that the ALJ ignored the medical evidence showing substantial nerve root involvement in plaintiff's lower spine, as well as neuro-anatomic distribution of pain, limitation of motion, muscle weakness, sensory and reflex loss, and positive straight leg raising.

### A.  Evidence of Nerve Root Compression Characterized by Neuro-Anatomic Distribution of Pain

The ALJ found that evidence of nerve root compromise was insufficient, noting that despite medical records from February and May of 2003 demonstrating disc herniation at the L3-L4 level which "compresses and displaces the *right* L3 nerve root" (T. 135, 141 with emphasis added), "[l]ater evaluation showed no nerve root compromise." (T. 19). The ALJ's assessment of the later evaluation, however, appears to be incorrect. That evaluation, which took place July 2, 2003, attempted to ascertain the cause of plaintiff's complaints of left elbow pain, and noted that no "*left sided* nerve root compression was visible" on the plaintiff's cervical spine, a finding which was noted to be "essentially unchanged" from the April 2002 study upon which the findings of nerve root displacement had been based. (T. 138). Because the later note refers only to the left side nerve root and was focused on plaintiff's cervical rather than lumbar spine, and moreover affirms that the plaintiff's follow-up MRI was "essentially unchanged" from the initial MRI upon which his right

side L3 nerve root compression diagnosis was based, the ALJ's conclusion that the plaintiff's nerve root compression had abruptly abated between May 2, 2003 and July 2, 2003 is unsupported by the medical record. (T. 138, 141). Indeed, the record contains no evidence that the nerve root compression in plaintiff's lumbar spine improved at any time. As such, I find that the medical evidence establishes that plaintiff's *right* L3 nerve root was compromised by the L3-L4 disc herniation.

Furthermore, the record contains appreciable evidence of neuro-anatomic distribution of pain stemming from the L3-L4 disc herniation and resulting compression, which would be expected to manifest in the lower right leg and foot. Specifically, several reports from plaintiff's treating and examining physicians note back pain with radiation of numbness and weakness into plaintiff's right leg (T. 123, 161, 181, 208), including the knee (T. 209), as well as diminished function and weakness in the right lower extremity (T. 141, 165), weakness in the foot and toes including a right "drop foot," and diminished right knee jerk (T. 142, 162).

### B.    Limitation of Motion of the Spine

Contrary to the ALJ's findings, several of the treating and examining physicians' reports also indicate an ongoing limitation of motion in plaintiff's spine. On January 10, 2003, treating physician Dr. Deshmukh noted that his range of motion extended to forward flexion only. (T. 124). On May 7, 2003, treating physician Dr. Lebowitz noted forward flexion limited to 30 to 40 degrees. (T. 186). On July 31, 2003, examining physician Dr. Devanny noted that plaintiff could only bend forward to barely touch the top of his knees. (T. 172). On October 6, 2003, examining physician Dr. Medalle

noted cervical flexion, extension and rotary movement limited to 30 degrees. (T. 155). On June 20, Dr. Lebowitz again noted that plaintiff could not flex his back for more than a few degrees. (T. 200).

### C. Motor Loss: Atrophy with Associate Muscle Weakness or Muscle Weakness, Accompanied by Sensory or Reflex Loss

The ALJ's finding that plaintiff's motors were "normal" with no evidence of sensory or reflex loss is also not supported by the record. Treating physician Dr. Deshmukh noted on January 10, 2003, the plaintiff suffered from decreased strength and flexion in his right foot, with grossly diminished sensory ability. (T. 124). Repeated examinations by plaintiff's treating and examining physicians showed loss of reflex activity, in the form of diminished right knee jerk. (T. 124, 142, 172). Abnormal gait, diminished bilateral leg strength, difficulty in flexing the right foot, dragging of the right foot and foot drop, were also noted by both treating and examining physicians. (T. 181, 230).

### D. If Involvement of the Lower Back, Positive Straight-Leg Raising Tests (Sitting and Supine)

Plaintiff's treating physicians variously noted straight leg raising tests which were positive at 30 or 40 degrees. (T. 124, 186). An examining physician found a positive straight leg raising test at 30 degrees, both sitting and supine (T. 155).

Under these circumstances, I find that the ALJ improperly substituted his own opinion for the opinions of plaintiff's treating physicians (and indeed, several of the examining physicians) by ignoring or rejecting their findings. It is well-settled that "the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Carter*, 221 F.3d 126, 134 (2d Cir.

2000). In determining what weight to give a treating physician's opinion, the Commissioner must consider: (1) the length, nature and extent of the treatment relationship; (2) the frequency of examination; (3) the evidence presented to support the treating physician's opinion; (4) whether the opinion is consistent with the record as whole; and (5) whether the opinion is offered by a specialist. 20 C.F.R. § 404.1527(d). Further, the ALJ must articulate his reasons for assigning the weight that he does accord to a treating physician's opinion. *Shaw*, 221 F.3d at 134; *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[f]ailure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.") (internal quotations omitted).

Here, the ALJ offers no explanation for discounting the record evidence concerning the plaintiff's nerve root impingement, neuro-anatomic distribution of pain, limitation of spinal motion, muscle atrophy, sensory loss, motor loss, and positive straight leg raising tests. The opinions of plaintiff's treating physicians with respect to those aspects of his condition, which were supported by objective medical evidence and in many cases corroborated by the opinions of examining physicians, should have been afforded controlling weight.

A remand for the calculation of benefits is warranted because further administrative proceedings or another hearing would serve no useful purpose. *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Martinez v. Commissioner*, 262 F. Supp. 2d 40, 49 (W.D.N.Y. 2003) ("[w]here the existing record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no further purpose, a remand for calculation of benefits is appropriate."). The record here has already been developed fully for the relevant period, and there is persuasive proof of disability. Accordingly, remand for calculation and payment of benefits is warranted.

## CONCLUSION

The Commissioner's motion for judgment on the pleadings (Dkt. #4) is denied. Plaintiff's motion to remand for the calculation and payment of benefits (Dkt #5) is granted. The final decision of the Commissioner is reversed, and the case is remanded for calculation and payment of Social Security disability insurance benefits.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       March 17, 2008.